IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:23-CR-00199-RJC-DCK

| USA | ) | |
|---|---|---|
| | ) | |
| v. | ) | ORDER |
| | ) | |
| MALACHI SAYADH ANTHONY | ) | |
| | ) | |

**THIS MATTER** comes before the Court on the defendant's Motion to Suppress, (Doc. No. 16); the government's response, (Doc. No. 19); the defendant's reply, (Doc. No. 20), and related documents. After an evidentiary hearing, the Court will deny the Motion to Suppress for the reasons explained below.

I.  FACTS

During the hearing Probation and Parole Officer (PPO) Bryan Evans from the North Carolina Department of Adult Correction and Officer Kelly Zagar from the Charlotte-Mecklenburg Police Department (CMPD), testified credibly about their actions leading up to and during a warrantless search of a vehicle in which the defendant was a passenger.[1] Accordingly, the Court finds the facts detailed in this Order were established by the preponderance of evidence.

---

[1] The defendant attempted to impeach PPO Evans based on his involvement in United States v. Watkins, Case No. 3:20-cr-365. (Doc. No. 23: Hr'g Tr. at 171, 187). In that case, PPO Evans and another probation officer relied on a search condition which allowed warrantless searches of a supervisee's residence. The North Carolina Court of Appeals subsequently ruled that the condition exceeded legislative authority. State v. McCants, 275 N.C. App. 801 (2020). A federal judge suppressed evidence found in the residence, but noted that the officers acted with good intentions and in accordance with the policy at the time of the search. United States v. Watkins, Case No. 3:20-cr-365, 2021 WL 5496672, at *6 (NCWD, Nov. 23, 2021).

A. Post-Release Supervision

On November 8, 2018, the defendant received a 48 to 78 month consolidated sentence for robbery with a dangerous weapon and breaking and entering in Mecklenburg County. (Doc. No. 11: Pretrial Services Report at 4). He also received a 10 to 21 month consolidated sentence for larceny of a motor vehicle and breaking and entering a motor vehicle in Union County on December 13, 2018. (Id. at 5). He was placed on post-release supervision in Mecklenburg County in both cases with a parole start date of February 3, 2023, and warned that he could be returned to prison to serve the time remaining on the maximum imposed term if he violated a condition. (Def. Ex. 1, Form PCAR180A; Gov't Ex. 13, Narrative Form PP36).

On January 17, 2023, he acknowledged that the Post-Release Supervision & Parole Commission (Commission) had imposed conditions including the "required condition" that he not commit another crime and the "controlling conditions" that he not use illegal drugs or possess a firearm.[2] (Gov't Ex. 10, Form PCAR180B). He was obligated to make known his whereabouts to his supervising officer at all times. (Id.). The defendant agreed to abide by further conditions including submitting at reasonable times to searches of his person by a probation/parole officer for purposes reasonably related to his supervision, being on high-risk supervision, and adhering

---

This Court finds that PPO Evans's conduct in that case does not affect his credibility in this one.

[2] Failure to comply with the required and controlling conditions subject a supervisee to revocation and reimprisonment. N.C.G.S. §§ 15A-1368.3 -1368.4(b), (e). A supervisee can earn time credits for complying with "reintegrative conditions." N.C.G.S. § 15A-1368.4(d).

2

to a curfew as directed by his supervising officer. (Gov't Ex. 11, Form PCAR111D). On February 6, 2023, the defendant executed a curfew compliance form stating his understanding that his curfew could be monitored electronically and that he could be required to wear a device to ensure compliance. (Gov't Ex. 12, Form DCC-157).

On March 7, 2023, PPO Bryan Evans noted the defendant had violated conditions regarding following mental health treatment requirements, using illegal drugs (THC, cocaine, methamphetamine, ecstasy), and missing curfew. (Gov't Ex. 13, Narrative Form PP36). Technology can be used in managing offenders. (Gov't Ex. 9, Technology and Monitoring Programs). PPO Evans had authority to place the defendant on radio frequency (RF) monitoring, which only reports whether a supervisee is at his residence during curfew. (Doc. No. 23: Hr'g Tr. at 86, 98). The Commission has authority to approve electronic monitoring using a GPS device with the capability to monitor a supervisee's movements at other times and places. (Id. at 87-88). PPO Evans recommended that the Commission modify the defendant's conditions without a violation and requested electronic monitoring "to ensure compliance with conditions." (Gov't Ex. 14, Parole/Post Release Modification Request Form DCC-169).

The Commission approved the modification of his conditions on March 22, 2023, to add:

> SUBMIT TO ELECTRONIC MONITORING AND ADHERE TO A
> CURFEW AS DIRECTED BY MY SUPERVISING OFFICER UNTIL
> NOTIFIED BY THE POST-RELEASE SUPERVISION AND PAROLE
> COMMISSION THAT IT IS NO LONGER NECESSARY.

3

(Gov't Ex. 15, Agreement Form PC-104(a) (all caps in original)).  As detailed above, curfew was already in place as a standard condition of post-release supervision; thus, electronic monitoring was added as a special condition. (Def. Ex. 8, OPUS Chronology at 6).

The defendant could have objected and sought a hearing to contest the alleged violation and proposed condition. (Doc. No. 23: Hr'g Tr. at 103).   Instead, he signed the agreement acknowledging that he could be arrested and held as a post-release/parole violator if he violated any of the conditions of his release, that he understood what he was doing, and that no pressure of any kind had been used against him at the time of signing the agreement. (Gov't Ex. 15, Agreement Form PC-104(a)).  The form warns that possession of a firearm by a felon is a violation of federal and state law. (Id.).

He also executed an Electronic Monitoring Rules and Regulations form, agreeing to the hours of his electronically monitored curfew, recognizing that he could have "Exclusion zones" which he could not enter, and acknowledging the equipment and other means would be used to monitor his compliance. (Gov't Ex. 16, Form DCC-70).  Such zones would include gun shops and places where drugs are used. (Doc. No. 23: Hr'g Tr. at 110-111).   Monitoring would also reveal if the supervisee left the county without authorization or missed required treatment. (Id. at 111-114).  In explaining the new condition to the defendant, PPO Evans did not advise or imply that that electronic monitoring would only be used to monitor his curfew. (Id. at 101).

4

Case 3:23-cr-00199-RJC-DCK   Document 24   Filed 03/07/24   Page 4 of 17

B.   Use of Location Monitoring

Two weeks after the defendant signed the electronic monitoring agreement, CMPD Officer Kelly Zagar, North Tryon Crime Reduction Unit ("CRU"), viewed an Instagram Story video posted by user "malkutta" at 7:09 p.m. on April 7, 2023. (Id. at 7). Officer Zagar recognized the defendant in the video from a stop on February 21, 2023, and knew that he was a felon, on parole, and a gang member. (Id. at 8-9). The video shows the defendant on the front porch of his post-release residence producing a silver revolver from his hoodie pocket and pointing it at the camera. (Gov't Ex. 1).

Officer Zagar contacted PPO Evans on April 8, 2023, at approximately 1:11 p.m. about the Instagram post. (Def. Ex. 3, Narrative). PPO Evans was Officer Zagar's point of contact to determine whether parolees suspected of criminal activity were subject to electronic monitoring. (Doc. No. 23: Hr'g Tr. at 15). They had worked together in the past to share parolees' location information and recover firearms. (Id. at 118, 122-123). After receiving credible information that the defendant was violating the conditions of his parole by possessing a firearm and considering public safety given the defendant's mental health concerns, PPO Evans agreed to assist Officer Zagar in locating the defendant. (Id.).

Officer Zagar later viewed another Instagram Story video posted by "malkutta" at 2:28 p.m. that day showing the defendant on his front porch, wearing a black and white camouflage ski mask, and pointing a silver semi-automatic pistol at the camera. (Gov't Ex. 5). There was another person in the video who was

5

wearing an orange ski mask and brandishing a silver revolver similar to the one in the previous video. (Id.). Officer Zagar provided that additional information to PPO Evans and the CRU. (Doc. No. 23: Hr'g Tr. at 22).

PPO Evans checked the defendant's location using his ankle monitor at approximately 4:14 p.m. (Id. at 123). He notified Officer Zagar of the defendant's general location so that the CMPD could plan its operation. (Id.). PPO Evans began tracking the defendant's movements in real-time at 4:50 p.m. in anticipation of the CRU coming on duty at 5 p.m. (Def. Ex. 3, Narrative). He began providing real-time updates to Officer Zagar at 4:59 p.m. (Id.).

Location monitoring indicated the defendant was at a restaurant on Eastway Drive in Charlotte. (Doc. No. 23: Hr'g Tr. at 25). When Officer Banham arrived, he did not see the defendant, but did observe a gold SUV leaving the parking lot. (Id.). Location monitoring then placed the defendant at a residence on Bannister Place, where Officer Zagar saw a similar vehicle with an expired tag. (Id. at 25-26). He followed the vehicle when it left the residence, and PPO Evans confirmed that the defendant's ankle monitor was moving consistently with the vehicle. (Id. at 26-27). Thus, Officer Zagar suspected that the defendant was inside where he could see the front seat passenger was a male with a tall stature similar to the defendant. (Id. at 27).

When the vehicle parked at the QT gas station on Trailer Drive in Charlotte, other CMPD Officers approached and made contact with the driver, DeShawn Thompson, and the passenger, the defendant, at approximately 5:25 p.m. (Id. at 28-

6

29). The defendant was wearing gold rimmed sunglasses as in the video. (Id. at 30). Based on information provided by Officer Zagar, the officers frisked the two men, but did not find anything. (Id. at 28-29). One of the officers frisked the vehicle found a loaded stainless steel Jimenez Arms, Model J.A. Nine, 9mm semi-automatic pistol underneath the defendant's seat. (Gov't Ex. 7)). There was a round in the chamber and the serial number was defaced. (Doc. No. 23: Hr'g Tr. at 30, 34). There was also a white and black camouflage ski mask, identical to the one the defendant wore in the video, on the defendant's seat. (Id. at 30). An officer searched the defendant incident to his arrest for being a felon in possession of a firearm and found approximately 4 grams of suspected methamphetamine, which was later determined to be crack cocaine, in his pants pocket. (Id. at 30-31). Officers cited Thompson for the expired registration and released him from the scene. (Id. at 32).

The defendant was transported to the North Tryon Team Office, where Officer Zagar recorded his interview with a body worn camera. (Id. at 32-33). Officer Zagar advised the defendant of his Miranda rights, and the defendant stated that he had the pistol to protect his home. (Id. at 33). He also acknowledged his armed robbery conviction and gang membership. (Id.). The defendant explained that he had just traded a .38 caliber revolver for the 9mm pistol earlier that day at his house. (Id.).

The defendant was arrested on state charges of possession of a firearm by a felon, removing a gun serial number, possessing methamphetamine, and carrying a concealed gun. (Doc. No. 11: Pretrial Services Report at 5). A federal grand jury

7

later indicted the defendant for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (Doc. No. 1). The instant motion followed.

## II. DISCUSSION

The defendant asserts that under state law the parole officer could not track his location for any purpose other than enforcing his curfew. (Doc. No. 16: Motion at 1). Thus, when PPO Evans used the electronic monitoring system to help Officer Zagar locate the defendant, an unconstitutional "search" of his physical movements violated the Fourth Amendment. See Carpenter v. United States, 138 S. Ct. 2206, 2217 (2018) (obtaining cell site location information from wireless phone carrier was a search); Grady v. North Carolina, 575 U.S. 306, 309 (2015) ("a State conducts a search when it attaches a device to a person's body, without consent, for the purpose of tracking that individual's movements).

The government does not contest that a search occurred, but rather argues that the defendant did not have a reasonable expectation of privacy in his physical movements while on the electronic monitoring condition, which he agreed to as part of his post-release supervision and which was not restricted to curfew enforcement. (Doc. No. 19: Response at 1). The Court finds that the government's position is correct because a parolee who signs documents accepting electronic monitoring has a severely diminished expectation of privacy. United States v. Lambus, 897 F.3d 368, 410 (2d Cir. 2018).

A. Diminished Expectation of Privacy

After finding that attaching a device to a person to track his movements constitutes a search, the Supreme Court recognized:

> That conclusion, however, does not decide the ultimate question of the program's constitutionality. The Fourth Amendment prohibits only unreasonable searches. The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations.

Grady, 575 U.S. at 310 (citing Samson v. California, 547 U.S. 843 (2006)). In Samson, the Court retraced its holding in United States v. Knights, 534 U.S. 112, 119 (2001), that "by virtue of their status alone, probationers do not enjoy the absolute liberty to which every citizen is entitled, justifying the imposition of reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." 547 U.S. at 848-49 (cleaned up). Parolees have even fewer expectations of privacy because parole is more akin to imprisonment than probation is. Id. at 850. Additionally, the Court approved probation searches as necessary to the promotion of the government's dual interests in the rehabilitation of the probationer and the protection of the public. Thus, a parolee who signs an order submitting to a search condition does not have an expectation of privacy that society would recognize as legitimate. Id. at 852.

The United States Court of Appeals for the Second Circuit applied Samson and Knights to reverse the suppression of location monitoring data that a parole officer gathered using a GPS device for two years in aid of a federal drug trafficking investigation. Lambus, 897 F.3d at 372. As in this case, that defendant violated the

9

conditions of his post-release supervision. In lieu of going back to prison, he agreed to the installation of a GPS ankle bracelet and signed forms acknowledging that GPS monitoring was being imposed as a special condition of his release. The Second Circuit recognized that the choice between the two options was difficult, but did not render his choice coerced. Id. at 410. His acknowledgement that parole officers had the right to search his person and his signing of the Special Conditions/GPS Monitoring Form in which he agreed to wear the transmitter and keep the monitor plugged into his phone twenty-four hours a day, seven days a week was "inconsistent with either a legitimate or reasonable expectation of privacy protecting him from constant search via GPS." Id. Additionally, a parole officer's duty to verify whether a supervisee is committing other crimes often necessarily involves coordination with law enforcement officers. Id. at 404.

1. Defendant Agreed to Electronic Monitoring Condition

The defendant insists that he did not have the option of refusing electronic monitoring. (Doc. No. 20: Reply at 14). However, the evidence before the Court shows he did. As detailed above, PPO Evans documented the defendant's violations on March 7, 2023, which subjected him to reimprisonment under N.C.G.S. §15A-1368.3. (Gov't Ex. 13, Narrative Form PP36). On March 21, 2023, PPO Evans requested that the Commission approve electronic monitoring as modification without violation to ensure compliance with conditions. (Gov't Ex. 14, Form DCC-169). The defendant could have contested the alleged violations and special condition, but chose to enter an Agreement with the Commission modifying his

10

conditions to include "submit to electronic monitoring and adhere to a curfew …" (Gov't Ex. 15, Form PC-104(a)).  The defendant acknowledged that he understood and would strictly follow the conditions, that he understood and knew what he was doing, that no promises or threats had been made to him, and that no pressure had be used against him at the signing of the Post-Release/Parole Agreement. (Id.). Accordingly, the Court finds that he agreed to the electronic monitoring condition, manifesting a severely diminished expectation of privacy. Lambus, 897 F.3d at 410.

    2.     Electronic Monitoring Condition Not Limited to Curfew

The defendant asserts that he only had a diminished expectation of privacy in his physical movements during his curfew hours from 6 p.m. to 6 a.m. (Doc. No. 16: Motion at 6).  Thus, the use of his location information outside of those hours was unreasonable. (Id. at 12).  His position is based on an overly narrow reading of the statutes governing his post-release supervision and the documents he signed.

First, the statutory definition of "electronic monitoring" means monitoring with a device that is not removed from a person's body and computer system that actively tracks a person's location at least once every minute 24 hours a day; has a battery life of at least 48 hours; and records the person's presence at a crime scene or prohibited area, or his departure from a specified geographic location. N.C.G.S. §15A-101.1(3a).  The defendant's Electronic Monitoring Rules and Regulations form mirrors those requirements.  He agreed not to remove the equipment and understood that the non-removable unit must be charged as instructed. (Gov't Ex. 16, Form DCC-70 ¶¶ 5, 9). If monitoring only related to curfew, there would be no

11

reason to wear the unit constantly and away from his residence. He understood that he could not enter any Exclusion zones deemed necessary by his supervision conditions or general statutes. (Id. ¶ 4). His conditions prohibited him from frequenting a place where illegal drugs are used or sold, from being on the premises of the victim of his offense, and from leaving the county without approval. (Gov't Ex. 11, Form PCAR111D). If monitoring only related to curfew, there would be no reason to reference Exclusion zones.

Second, the one approved post-release supervision condition for non-sex offenders that specifically mentions electronic monitoring does not use the word "curfew." The text reads: "Remain in one or more specified places for a specified period or periods each day, and wear a device that permits the defendant's compliance with the condition to be monitored electronically and pay a fee …" N.C.G.S. §15A-1368.4(e)(13). If electronic monitoring were limited to a curfew at the defendant's residence, there would have been no reason to use the plural for places and periods.[3] There is nothing in the statutory text that would prohibit monitoring the defendant's requirement to be at other places at other times required by his supervision conditions, such as remaining in the county, participating in mental health treatment, and maintaining employment. (Gov't Ex. 11, Form PCAR111D). The defendant's violations involved non-compliance with

---

[3] In contrast, a probation condition imposing a "curfew" requires the offender to remain "in a specified place [singular] for a specified period [singular] each day and wear a device that permits the offender's compliance with the condition to be monitored electronically." N.C.G.S. §15A-1342.2(e).

12

mental health treatment, illegal drug use, and missed curfew. (Gov't Ex. 13, Narrative Form PP36). Thus, the defendant's Agreement with the Commission stated the modification of his conditions included "submit to electronic monitoring and adhere to a curfew …" (Gov't Ex. 15, PC-104(a)). If modification were limited to the curfew condition, the Agreement would have read, "adhere to a curfew monitored electronically."

Third, the availability of "satellite-based monitoring" that automatically reports violations of schedule and location requirements of repeat, sexually violent predators, N.C.G.S. §§ 14-208.40, 15A-1368.4(b1), did not preclude the less restrictive electronic monitoring of the defendant. The sex offender monitoring program must be approved by a court at sentencing, is imposed without his consent, and can remain in place even after the offender completes his sentence. N.C.G.S. §§ 14-208.40A; Grady v. North Carolina, 575 U.S. 306, 309-310 (2015). Before going on electronic monitoring, the defendant was obligated to make known his whereabouts to his supervising officer at all times. (Gov't Ex. 10, Form PCAR180B). Nothing in the Technology on Monitoring Program policy prohibits using electronic monitoring to enforce that condition. (Gov't Ex. 9). PPO Evans made a limited use of the electronic monitoring system after receiving credible information of firearm possession to locate the defendant, who had agreed to its use as a modification to his post-release supervision conditions. The defendant's cabined view of electronic monitoring would reduce it to the RF monitoring program, which can be imposed

13

without approval by the Commission and is limited to compliance with curfew by reporting a supervisee's presence or absence at his residence. (Id.).

Fourth, the defendant contends that the "catch-all" provision in N.C.G.S. §15A-1368.4(c) which authorizes the Commission to impose discretionary conditions necessary to ensure that the supervisee leads a law-abiding life does not permit monitoring outside curfew hours. (Doc. No. 20: Reply at 2). He relies heavily on State v. McCants, 275 N.C. App. 801 (2020), which involved the warrantless, suspicion-less search of a post-release supervisee's home as part of a large federal, state, and local law enforcement joint operation. As a matter of statutory construction, the North Carolina Court of Appeals held that the catch-all provision could not authorize the Commission's expansion of the search condition in N.C.G.S. §15A-1368.4(e)(10) to include a supervisee's home where the legislature had limited the search condition to the supervisee's person. Here, the defendant has not shown that the legislature likewise limited the scope of electronic monitoring to residential curfew compliance, particularly where the statutory definition of electronic monitoring encompasses its use for other times and places.

The Court finds that the defendant did not have a legitimate expectation of privacy in his physical movement outside of his curfew hours. Examining the totality of the circumstances, PPO Evans acted reasonably when he accessed the monitoring system and provided the defendant's location to Officer Zagar to investigate suspected gun possession. The defendant was on high-risk post-release supervision for robbery with a deadly weapon and other offenses, was classified as

14

an extreme risk of being rearrested and was a validated member of the Bloods security risk group. He violated the original conditions of his release through non-compliance with mental health treatment requirements, using four types of illegal drugs, and missing curfew, for which he was subject to reimprisonment. Instead, he agreed to the modification of his conditions to include electronic monitoring approved by the Commission. Within weeks of that Agreement, he was observed in two videos posted on consecutive days in possession of two different guns, although he was prohibited from possessing firearms as a felon and a post-release supervisee. PPO Evans accessed the defendant's location data for purposes reasonably related to his supervision within 2 hours of the posting of the second video and only monitored it for approximately 75 minutes. For approximately 30 minutes of that time, PPO Evans provided the defendant's location data to Officer Zagar, who arrived at his location and followed the vehicle he was in until it could be stopped for further investigation by other officers. Therefore, PPO Evans did not engage in an unreasonable search, and the motion to suppress will be denied.

B.   Special Needs

Alternatively, the Court finds that accessing the location data was justified by North Carolina's "special need" to supervise the defendant's compliance with his supervision conditions in order to promote his rehabilitation and protect the public's safety. In <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 873-74 (1987), the Supreme Court recognized a state's operation of a probation system presents a special need beyond

15

normal law enforcement that justified departure from the usual warrant and probable cause requirements of a search.

The United States Court of Appeals for the Fourth Circuit examined North Carolina's probation system and found the state had "the identical need to supervise probationers' compliance with the conditions of their probation in order to promote their rehabilitation and protect the public's safety." United States v. Midgette, 478 F.3d 616, 623 (4th Cir. 2007).  In United States v. Scott, 941 F.3d 677, 684 n.4 (4th Cir. 2019), the appellate court applied Midgette to post-release supervision.  A search conducted pursuant to a valid supervision regulation is reasonable under the Fourth Amendment. Griffin, 483 U.S. at 880.

As detailed above, PPO Evans's accessing the defendant's location information was a valid use of electronic monitoring to ensure his compliance with the supervision condition that he not possess a firearm.  Therefore, the Fourth Amendment was satisfied and a warrant was not required.

    C.    Wong Sun

The defendant only challenges the search of his physical movements under the Fourth Amendment.  He argues that evidence gained from that search should be suppressed fruit of the poisonous tree. Wong Sun v. United States, 371 U.S. 471, 488 (1963). Thus, the Court need not independently consider the legality of the stop and search of the vehicle and post-arrest statements by the defendant.

## III. CONCLUSION

PPO Evans reasonably accessed the defendant's location after Officer Zagar credibly suspected the defendant of possessing a firearm. The defendant had a severely diminished expectation of privacy in his physical movements while on post-release supervision. The search was a valid exercise of the electronic monitoring condition and reasonably related to his supervision.

**IT IS, THEREFORE, ORDERED** that the Motion to Suppress, (Doc. No. 16), is **DENIED**.

Signed: March 6, 2024

Robert J. Conrad, Jr.
United States District Judge